[S. F. No. 6382. In Bank.—July 28, 1914.]

HARTFORD FIRE INSURANCE COMPANY (a Corporation), Respondent, v. FRANK C. JORDAN, as Secretary of State of the State of California, et al., Appellants.

PUBLIC OFFICERS—SECRETARY OF STATE—CORPORATE LICENSE-TAXES ILLEGALLY EXACTED—OFFICER NOT PERSONALLY LIABLE AFTER PAYMENT INTO TREASURY.—The secretary of state of the state of California is not personally liable for moneys collected by him in his official capacity, and paid to him under protest, in satisfaction of illegal corporate license-taxes imposed on insurance corporations in consonance with the requirements of the act of March 20, 1905 (Stats. 1905, p. 493), after he has paid such moneys into the state treasury as required by law.

ID.—JUDGMENT AGAINST OFFICER IN INDIVIDUAL CAPACITY—APPEAL AS OFFICIAL—RIGHT TO SUE STATE—QUESTION NOT INVOLVED.—Where an action is brought against a state officer in both his official and individual capacities, and a judgment is rendered against him solely as an individual, he has no right to appeal therefrom in his official capacity. On such an attempted appeal, the court will not consider the question whether or not the action was in legal effect one against the state, which the superior court had no jurisdiction to entertain.

ID.—INSURANCE COMPANIES—NOT LIABLE FOR LICENSE-TAXES AFTER ADOPTION OF SECTION 14 OF ARTICLE XIII OF CONSTITUTION.—Section 14 of article XIII of the state constitution, adopted in November, 1910, providing for the levy and collection of taxes exclusively for state purposes upon the franchises of insurance companies, at a specified percentage upon the amount of their gross premiums received upon business done in this state, and that such taxes "shall

be in lieu of all other taxes and licenses, state, county and munici-
pal," upon the enumerated property of such companies, superseded
the corporation License Tax Act of March 20, 1905, so far as it af-
fected such corporations, and exempted them from the payment of
such license-tax. *San Francisco* v. *Pacific Telephone & Telegraph
Co.,* 166 Cal. 244, approved.

Id.—Involuntary Payment—Duress of Law—Avoidance of Proc-
lamation of Forfeiture of Right to do Business.—The payment
by an insurance company of a corporate license-tax illegally exacted
of it after the taking effect of section 14 of article XIII of the
constitution, in order to avoid a proclamation by the governor of the
state, issued in conformity with the provisions of the act of March
20, 1905, declaring that it had forfeited its right and was without
authority to do business in the state, was not a voluntary payment,
but one compelled under duress of the law. This is true, notwith-
standing a declaration of forfeiture under that act, following the
proclamation of the governor, would have had no legal efficacy on
account of the illegality of the license-tax.

Id.—Right of Insurance Company to do Business is a Franchise—
Such Franchise is Property.—The right of insurance companies,
whether domestic or foreign, to do an insurance business in this
state is a franchise, and is property of the company engaged in it.
It is upon this franchise that under such provisions of the constitu-
tion the tax therein provided for is levied. The state license-tax
imposed under the act of March 20, 1905, as it stood when the con-
stitutional provision was adopted, was a tax for revenue imposed,
so far as insurance companies are concerned, on their franchise right
to do business in the state.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco. J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, and John H. Riordan, Dep-
uty Attorney-General, for Appellants.

Coogan & O'Connor, Samuel Knight, and Page, McCutchen.
Knight & Olney, for Respondent.

THE COURT.—A rehearing was granted in this case for
consideration of the sole question of the personal liability of
defendant Frank C. Jordan, against whom, as an individual,
judgment was given. This question did not receive the atten-
tion it merited, the mind of the court being led away from a

consideration of its real importance by the fact that it was stipulated at the trial of the cause that no attempt would be made to enforce a personal judgment against Jordan, if in fact such a judgment was given. On rehearing it is pressed upon our attention with a force which cannot be combatted that the silence of the opinion of the court upon this question is necessarily a determination that a public officer, under the indicated circumstances, is personally responsible, and it is urged that the question should be distinctly determined by the court. To that point and to that point alone this consideration is addressed, the opinion of the court heretofore given, in all other respects, standing affirmed and approved.

As to the facts controlling this consideration it is to be noted that everything that Jordan did was in consonance with the language of the law of the state and was done in his ministerial official capacity. He certified the list of delinquent corporations to the governor as the state law in terms ordered him to do. The governor made his proclamation to the effect that the delinquent corporations would forfeit their right to do business in the state if their license-fees were not paid upon the date fixed by the statute. Jordan, as secretary of state, received the fees, as the law declared it his duty to do, which were paid under protest by plaintiff. Thus the duress on plaintiff was the duress of the law and not the duress of officers of the law. The fact that the money was paid to Jordan under protest enlarged neither his powers nor his liabilities. The law itself made plain the steps which he must take upon receipt of such moneys, whether paid under protest or not. It is the duty of all state officers to pay all moneys received by them in their official capacities into the state treasury. (Stats. 1906, p. 43.) They must make these payments monthly. It is the duty of the state treasurer to keep all moneys in the state treasury. (Pol. Code, sec. 452.) Once deposited in the state treasury funds can be taken therefrom only upon warrant of the state controller after audit by the state board of control. (Pol. Code, sec. 663 et seq.) It is pleaded and admitted that Jordan so paid the money into the state treasury. He was not only under the mandate of our fiscal civil laws so to do, but he was equally under the strong compulsion of the penal laws, since by section 424 of the Penal Code, his willful omission or refusal to pay over the moneys to the treasurer would have been a felony, punish-

able by imprisonment for from one to ten years and by perpetual disqualification from holding office in the state. Therefore, notwithstanding the protest of plaintiff, Jordan could not, without committing a felony, have held the money in his own possession to respond to the judgment which plaintiff might obtain against him as an individual.

There will be found in the earlier adjudications a strictness of accountability upon the part of public officers which has been greatly and justly abated. Thus in *Elliott* v. *Swartwout,* 10 Pet. 137, [9 L. Ed. 373], it is said:

"The case put by the other point is where, at the time of payment, notice is given to the collector that the duties are charged too high and that party paying so paid to get possession of his goods, and accompanied by the declaration to the collector that he intended to sue him to recover back the amount erroneously paid, and notice given to him not to pay it over to the treasurer. This question must be answered in the affirmative, unless the broad proposition can be maintained that no action will lie against the collector to recover back an excess of duties paid him, but that recourse must be had to their government for redress. Such principle would be carrying an exemption to a public officer beyond any protection sanctioned by the principles of law or sound public policy."

*Cary* v. *Curtis,* 3 How. 236, [11 L. Ed. 576], announces the same doctrine touching the responsibility of the agent where protest has been made at the time of payment, and Justice Story, in the course of his dissenting opinion in that case speaks as follows:

"Hence it is a doctrine of common law (so far as my researches extend) absolutely universal, that if a man, by fraud, or wrong, or illegality, obtains or exacts, or retains money justly belonging to another, with notice that the latter contests the right of the former to receive, or exact, or retain it, an action for money had and received lies to recover it back; and it is no answer for the wrongdoer to say that he has paid it over to his superior; for, although as between the wrongdoer and his superior, the maxim may well apply, *respondeat superior,* yet the injured party is not bound to seek redress in that direction; and, *a fortiori,* he is not so bound, where, as in the case of the government, the superior is not suable. That would be a mere mockery of justice."

Of course these cases take no account of the unhappy dilemma of the agent, who is a public officer, when, as here, the law, notwithstanding the protest, compels him to pay over the money to his principal. This difference in the law is itself sufficient to demand the application of a different rule, and the opposite rule has in .fact been declared in this state upon every occasion where the question has arisen. Thus in *Phelan* v. *San Francisco,* 120 Cal. 1, [52 Pac. 38], the action was to recover taxes against the tax-collector, paid under protest. There, as here, the tax-collector had paid the money into the treasury, as the law compelled him to do, and, says this court: he "having paid the money into the treasury in obedience to his official duty, it would violate all principles of justice to hold him individually liable to the plaintiff therefor, upon the ground that he had refused to follow the plaintiff's directions to disregard his official obligation." *Bailey* v. *Johnson,* 121 Cal. 562, [54 Pac. 80], was an action upon an agreed case between a protesting taxpayer and a tax-collector. This court, in declaring the lack of power in the tax-collector to make such an agreed case, said: "He was but the agent of the county for the collection of the tax, with no interest other than that of an officer performing a duty enjoined by law, and with only such power and authority as the statute gave. He was not concerned in the question of the validity of the tax. If he failed to collect it because of its illegality, he was not responsible to the county; and if he collected it, and it subsequently proved to have been illegally assessed, he was not responsible to the aggrieved taxpayer." *Craig* v. *Boone,* 146 Cal. 718, [81 Pac. 22], was another case brought against the tax-collector by a protesting taxpayer. Here, with reference to and quotations from the above cited cases, the same doctrine is laid down. It conclusively follows herefrom that the defendant Jordan was not responsible to plaintiff and that the judgment against him in his individual capacity was therefore erroneous. To the end that it may be noted that the views of this court are not singular upon the question, but, as has been said, are in accord with the humane and just doctrine of later cases, reference may be made to 27 Am. & Eng. Ency. of Law, p. 795; 37 Cyc. 1187; 2 Cooley on Taxation p. 1477 et seq.; Mechem on Public Officers, sec. 694; Throop on Public Officers, sec. 760; Blackwell on Tax Titles, 4th ed., p. 187.

Following is that portion of the former opinion of the court which is here approved and adopted:

"Lorigan, J.: This action was brought by plaintiff in its own behalf, and as assignee of several other fire insurance companies, to recover certain moneys paid by them under protest as a state license-tax on fire insurance corporations for the fiscal year commencing July 1, 1911.

The license-tax in question is provided for under an act of the legislature entitled "An act relating to revenue and taxation providing for a license-tax upon corporations and making a provision for the purpose of carrying out the objects of this act," approved March 20, 1905 (Stats. 1905, p. 493), and amendments thereto.

This act, in as far as material to the questions presented here, and as it stood when the license-tax involved was paid, provides that every domestic corporation and every foreign corporation doing business in this state must procure from the secretary of state a license authorizing it to do so and pay a license-tax therefor, the amount of tax being based on the authorized capital stock of the corporation; makes the tax payable to the secretary of state on July 1st of each year and a delinquency of the corporation therefor if the tax is not paid by September 1st thereof. The act then provides for a report to the governor of the state by the secretary of state before the fifteenth day of September of each year of a list of delinquent corporations and the issuance forthwith by the governor of a proclamation declaring under the act "that the charters of such delinquent domestic corporations will be forfeited, and the right of such foreign corporations to do business in the state shall be forfeited" unless payment of the license-tax is made to the secretary of state on or before 4 o'clock of November 30th following. Provision is then made for the immediate filing of this proclamation of the governor in the office of the secretary of state; that said secretary shall immediately publish it, and that at the hour and date specified in the proclamation the charters of all domestic corporations which have failed to pay said license-tax shall be forfeited to the state and the right of all delinquent foreign corporations to do business in the state which have failed so to pay shall be likewise forfeited. The secretary of state is required to make out and transmit to each county clerk in the state, to be filed in his office, a list of such domestic and for-

eign corporations whose charters, or right to do business have been forfeited. It is further made unlawful for any corporation delinquent under the act, whether domestic or foreign, which has not paid the license-tax, to exercise the powers of such corporation or to transact any business in the state after November 30th next following the delinquency and declares that any person who exercises any of the powers of the corporation so delinquent, or who transacts business for or on behalf of the corporation, after the date last referred to, shall be guilty of a misdemeanor and subject on conviction to fine or imprisonment, or both. In addition it is provided that the directors or managers, in office, of a delinquent domestic or foreign corporation whose charter or right to do business is forfeited shall be deemed trustees of the corporation with full power to settle up its affairs.

Subsequent to the passage of the act and its amendments and in November, 1910, section 14 of article XIII of the constitution of this state was ratified.

That section as far as applicable here provides that:

"Sec. 14. Taxes levied, assessed and collected as hereinafter provided upon . . . telephone companies, . . . insurance companies, . . . and taxes upon all franchises of every kind and nature, shall be entirely and exclusively for state purposes, and shall be levied, assessed and collected in the manner hereinafter provided. . . .

"(b) Every insurance company or association doing business in this state shall annually pay to the state a tax of one and one-half per cent upon the amount of the gross premiums received upon its business done in this state, less return premiums and reinsurance in companies or associations authorized to do business in this state. . . . This tax shall be in lieu of all other taxes and licenses, state, county and municipal, upon the property of such companies. . . ."

The principal question on this appeal, though others are involved, is whether the constitutional provision quoted superseded the state corporation License Tax Act and thus exempted the plaintiff and its assignors from the payment of such tax.

The complaint alleged that plaintiff and its assignors are foreign fire insurance companies and were on July 1, 1911, each doing business in the state under certificates of authority regularly issued to them pursuant to law by the insurance

commissioner of the state still in full force and effect and that the value of the business of each in the state exceeded twenty thousand dollars. It then alleged the proceedings taken under the act—the making of a report by Jordan as secretary of state to the governor thereof on September 11, 1911, of a list of the corporations in the state claimed to have been delinquent in the payment to the state of license-taxes, which list included plaintiff and its assignors, and a proclamation issued by the said governor declaring that their right to do business in the state would be forfeited unless said license-tax was paid to the secretary of state by 4 o'clock P. M. of November 30, 1911; the filing of said proclamation and its publication as provided in the act. Further, that on October 17, 1911, Jordan, as such secretary notified and threatened plaintiff and its assignors that unless such tax was paid by them by November 30, 1911, the right of each to do business in the state would be forfeited; that solely by reason of said proclamation and threat of forfeiture and to prevent such threatened forfeiture, plaintiff and its assignors on November 29, 1911, paid involuntarily and under protest to said Jordan, as such secretary of state, the amounts claimed as said license-taxes under the act, and simultaneously therewith presented and delivered to said Jordan, and he accepted and filed in his office, a protest against said payments on the ground that the act under which it was being exacted was superseded by section 14 of article XIII of the constitution above referred to, and that its exaction was therefore unauthorized and illegal; that Jordan, as such secretary of state, thereafter turned over the amounts paid to the defendant Roberts as state treasurer; that subsequently a demand for repayment to plaintiff and its assignors was made by them upon both Jordan and Roberts as said secretary and treasurer, respectively, and by both refused.

The complaint as originally filed was against Jordan and Roberts in their official capacities only. Subsequently plaintiff by leave of court was allowed to amend the complaint by including said Jordan and Roberts in the title as defendants individually, and to amend the prayer by asking judgment also against them as individuals.

All the allegations of the complaint were admitted except the allegation that the money was paid involuntarily under a threat of forfeiture.

Plaintiff had judgment against the defendant Jordan individually, and from that judgment and an order denying their motions for a new trial, each of the defendants in all the capacities in which they were sued filed notice of this appeal.

Several grounds are urged for a reversal but the three main propositions upon which this is sought need only be considered.

Defendants first contend that the superior court had no jurisdiction to entertain this action. In that regard it is insisted that this is an action against the defendants as state officers in which judgment is sought against them in their official capacities; that while not nominally a suit against the state, in legal effect it is such and cannot be maintained under the principle that the state cannot be sued without its consent and there is no law under which consent to do so has been granted.

But we do not perceive that this point is involved on this appeal. The action was originally brought against Jordan and Roberts in their official capacities. It was amended so as to make them also defendants individually. During the trial the motion of defendants for a nonsuit in favor of Roberts as defendant officially and individually, was granted, and eliminated him entirely from the case. There was no judgment against Jordan in his official capacity but solely against him individually. While it is true this appeal purports to be taken by both defendants in the official capacity in which they were sued, as there was no judgment against either of them in that capacity, they had no right of appeal as such and there is therefore nothing in the case under which the question of the jurisdiction of the court attempted to be raised by them can be considered.

It is next insisted that the license-tax was voluntarily paid and hence cannot be recovered back.

The general rule for determining whether a payment illegally exacted is voluntary or involuntary, is well settled and its discussion is not necessary here because attention will be presently called to cases where under conditions similar to those shown here, if the payments herein named were illegally exacted they were made involuntarily and may be recovered back.

It appears here that under the provisions of the act in question the failure of the plaintiff to pay the tax to the state within the time provided would result in a proclamation declaring that it had forfeited its right and was without authority to do business in the state. The payment was made to prevent this threatened result and was paid under a written protest against its exaction as being illegal for the reasons therein stated and urged here. The act provided for no judicial proceeding or action by the state to be taken on failure of the plaintiff to pay the tax under which an opportunity would be afforded it to test its legality. A forfeiture by the self-executing provisions of the act is declared against the right of plaintiff to do business in the state and it was either compelled to make the license-tax payment or go out of business. Under the act the parties were not placed on equal terms. The plaintiff had no choice; it must either submit to the illegal exaction or go out of business. Nor had it any redress for such illegal exaction unless payment under such circumstances is regarded as involuntary and compelled under duress. It is true as asserted by appellants that a declaration of forfeiture under the act following the proclamation of the governor had no legal efficacy if the exaction of the tax against plaintiff was illegal; that if it was not subject to the tax no forfeiture could result from a mere proclamation which declared it and that when the right of plaintiff to do business was in any way attacked it could show this. Of course in any proceeding subsequent to the declared forfeiture against the corporation, its agents or officers, by the state in *quo warranto* proceedings or civil or criminal action, the attempted forfeiture under the act of the right of the plaintiff to do business might be disputed and declared invalid. But by that time great damage and injury might have resulted to the plaintiff from the fact that the forfeiture though unjustified had been declared. It is too clear for discussion that the effect of a proclamation declaring that the right of plaintiff to further do business in the state had been forfeited must necessarily work it an irreparable injury. Its business is to secure contracts of insurance therein and renewals thereof, and a proclamation of a forfeiture of its right to do so, even though not justified, would of itself—particularly as to fire insurance companies—have the direct effect of raising a question in the business community of the validity of contracts

which the company might seek to make and would naturally drive business which it might otherwise hold or secure, to other corporations engaged in a like business whose right to make them was not subjected to the same uncertainty and doubt.    While asserting in good faith that the exaction was illegal, plaintiff and its assignors could have no certainty that their contention would be sustained in some judicial proceeding brought subsequent to the proclamation of forfeiture, and if their claim was not then sustained they would have suffered the extraordinary penalty of having lost their right to do business in the state.    Under such circumstances to avoid this penalty, the only thing plaintiff could do was to make the payment under protest and if the license-tax was illegally exacted we are satisfied under the authorities that the payment was involuntary and plaintiff had a right to recover it back.

This precise question has arisen in cases where the tax was exacted under the provisions of acts, in the main, similar to ours, and some less drastic in their provisions, and where it was held that the payments made were involuntary and could be recovered back.

In *Atchison T. & S. F. Ry. Co.* v. *O'Connor*, 223 U. S. 280, [Ann. Cas. 1913C, 1050, 56 L. Ed. 436, 32 Sup Ct. Rep. 216], the action was to recover back a tax of two per cent on the capital stock imposed by an act of the state of Colorado. The plaintiff was a Kansas corporation.    As to the tax the Colorado law gave an action for debt to the state and provided that every corporation failing to pay the tax should forfeit its right to do business in the state until the tax was paid, with certain penalties as long as its payment remained in default. Plaintiff paid the tax under protest that the act was unconstitutional as levying a tax on interstate commerce.    The supreme court declared: ''The defendant did not argue that the tax could be maintained, but contended only that the payment was voluntary. . . . It is reasonable that a man who denies the legality of a tax should have a clear and certain remedy. . . . Of course, we are speaking of those cases where the state is not put to an action if the citizen refuses to pay.    In these latter he can interpose his objection by way of defense, but when, as is common, the state has a more summary remedy such as distress and the party indicates by protest that he is yielding to what he cannot prevent, courts

sometimes, perhaps, have been a little too slow to recognize the implied duress under which payment is made, but even if the state is driven to an action, if, at the same time, the citizen is put at a serious disadvantage in the assertion of his legal, in this case of his constitutional, rights by defense in the suit, justice may require that he should be at liberty to avoid those disadvantages by paying promptly and bringing suit on his side. He is entitled to assert his proposed right on reasonably equal terms. See *Ex parte Young*, 209 U. S. 123, 146, [14 Ann. Cas. 764, 13 L. R. A. (N. S.) 932, 52 L. Ed. 714, 28 Sup. Ct. Rep. 441]. . . . In this case the law besides giving an action of debt to the state, provides that every corporation that fails to pay the tax shall forfeit its right to do business within the state until the tax is paid and also shall pay a penalty of ten per cent for every six months or fractional part of six months of default after May 1st of each year. It may be that the forfeiture of the right to do business would not be authoritatively established except by a *quo warranto* provided for in a following section, but before or without the proceeding, the effect of the forfeiture clause upon the plaintiff's subsequent contracts and business might be serious. (See *Ludwig* v. *Western Union Tel. Co.*, 216 U. S. 146, [54 L. Ed. 423, 30 Sup. Ct. Rep. 280].) And, in any event the penalty would go on accruing during all the time that might be spent before the validity of the defense could be adjudged. As appears from the decision below, the plaintiff could have had no certainty of ultimate success and we are of opinion that it was not called upon to take the risk of having its contracts disputed and its business injured and in finding the tax more or less nearly doubled in case it finally had to pay. In other words, we are of opinion that the payment was made under duress.''

*Gaar, Scott & Co.* v. *Shannon*, 223 U. S. 468, [56 L. Ed. 510, 32 Sup. Ct. Rep. 236], was also an action to recover back money paid as a tax under protest. An act of the state of Texas required foreign insurance companies doing business in Texas to pay a certain franchise tax measured by their capital stock and provided that if by a given date payment was not made, a percentage penalty would be incurred, and that if the tax was not paid by a still further date the permit of such company to do business in the state would be forfeited ''without judicial ascertainment'' and the company de-

prived of the right to sue in the courts. Plaintiff, a foreign corporation doing business in Texas, paid the tax under protest on the ground that the amount was exacted under an unconstitutional law. Defendant contended that the payment was voluntary. The court holding to the contrary said: "Neither a statute imposing a tax nor the execution thereunder, nor a mere demand for payment, is treated as duress. It does not necessarily follow that there will be a levy on goods. Or, if there is, a citizen, to avoid the consequences of the levy may pay the money, regain the use of his property, and maintain a suit for the recovery of what has been exacted from him. The legal remedy redresses the wrong but he has the same right to sue if he pays under compulsion of a statute whose self executing provisions amount to duress. An act which declares that where the frachise tax is not paid by a given date a penalty of 25 per cent shall be incurred, the license of the company shall be canceled, and the right to sue shall be lost, operates much more as duress than a levy on a limited amount of property. Payment to avoid such consequences is not voluntary, but compulsory, and may be recovered back. Otherwise plaintiff might be without any remedy whatever.''

*Scottish Union Ins. Co.* v. *Herriott,* 109 Iowa, 606, [77 Am. St. Rep. 548, 80 N. W. 665], presents a case practically identical with the one at bar. A law of Iowa provided that foreign and domestic insurance companies on filing their annual statements should pay to the treasurer of the state as taxes a certain percentage tax (different as between foreign and domestic companies) on the gross amount of premiums received by them during the preceding year, taking a receipt therefor to be filed with the auditor of the state, who should not, until such filing, issue the annual certificate as provided by law authorizing the corporations to do business in the state. Upon failing to make payment of the taxes imposed when plaintiff filed its annual statement it was notified by the auditor that if the amount was not paid, action would be taken to collect the tax by distress or suit, and that the company would be precluded from doing business in the state. The plaintiff then paid the tax to the state under protest and subsequently sued to recover it back. It was claimed that the payment was voluntary. The court said: "Again it is said that the money was paid voluntarily and cannot be recovered

back.   The petition recites in substance that plaintiff had
large property interests in the state, which it was in duty
bound to preserve and protect and that the letter from the
auditor of the state made it impossible for plaintiff to con-
tinue its business or protect its property without paying the
tax.   At the time of the payment plaintiff filed with both
the treasurer and the auditor a written protest in which it
claimed that the tax was unconstitutional and invalid and
that by so paying it did not acknowledge its liability to pay
the tax or waive any of its rights to contest the same.   Plain-
tiff was bound to submit to the exaction or discontinue its
business.   Under such a state of facts, it is clear that plain-
tiff's act was not voluntary and that it may recover back the
amount paid, provided it has established its claim that the act
in question was unconstitutional.   (*Swift etc. Co.* v. *United
States,* 111 U. S. 23, [28 L. Ed. 341, 4 Sup. Ct. Rep. 244];
*Cunningham* v. *Monroe,* 15 Gray, 471;. *Carew* v. *Rutherford,*
106 Mass. 1, [8 Am. Rep. 287]; *Beckwith* v. *Frisbie,* 32 Vt.
559; *Shelton* v. *Platt,* 139 U. S. 594, [35 L. Ed. 273, 11 Sup.
Ct. Rep. 646], and cases cited in *State* v. *Nelson,* 41 Minn. 25,
[4 L. R. A. 300, 42 N. W. 548].)''

We refer to and quote from these cases because of their
practical identity with the case at bar.   Cases other than
those cited supporting the proposition that payment made
under similar conditions to those here are involuntary and
may be recovered back are *Swift etc. Co.* v. *United States,*
111 U. S. 29, [28 L. Ed. 341, 4 Sup. Ct. Rep. 244]; *Western
Union etc. Co.* v. *Mayer,* 28 Ohio St. 521, and our own cases
of *Lewis* v. *San Francisco,* 2 Cal. App. 112, [82 Pac. 1106],
and *Trower* v. *San Francisco,* 152 Cal. 479, [15 L. R. A. (N.
S.) 183, 92 Pac. 1025].

It is next insisted by appellant that insurance companies
are not exempt under the constitutional provision relied on
by respondent from the payment of the corporation license-
tax exacted by the act.   Appellant insists that it is matter of
grave doubt whether the constitutional provision was intended
to have this effect, and, hence, the rule of strict construction
against the exemption of property from taxes should be ap-
plied; that the provision contains no express exemption
respecting a ''license-tax'' or ''corporation license-tax'' and
that these terms should not be read into it.   Along the same
line it is insisted that as the only exemption proceeding from

the payment of the percentage tax provided by the constitutional amendments is from "all other taxes and licenses . . . *upon the property of such* companies," etc., and as there is no such thing as a "license upon the property," the word license as used in the provision is to be construed as intended to mean the same thing as "taxes"; that as the tax in question in this case is neither "a tax on property" nor a "license on property," but is purely a corporation license-tax on the intangible privilege or right of insurance companies to do business in the state, it is not embraced within the terms of the exemption in the constitutional provision.

These are the only points made by appellant against the exemption of such companies from the payment of the state license-tax by virtue of the terms of the constitutional provision.

An extended discussion of these points is rendered unnecessary by the decision of this court in *San Francisco* v. *Pacific Tel. & Tel. Co.*, 166 Cal. 244, [135 Pac. 971], rendered since the appeal in this case was submitted.

That action was brought to recover a license fee or tax imposed by an ordinance of the city and county of San Francisco enacted prior to the adoption of section 14 of article XIII of the constitution. The claim of defendant was that under such constitutional provision it was exempted from liability for such license charge. The trial court so held and that ruling was sustained here upon a full consideration of the subject.

In applying the reasoning of the court in that case to the contention of appellants in this, it is to be observed that though in the case referred to, a license-tax imposed on a telephone company under a municipal ordinance was involved, and here an act of the legislature imposing a state license-tax on insurance companies is under consideration, the same constitutional provision applies to both these classes of corporations. Both telephone and insurance companies are enumerated as among the persons and corporations to be taxed. By the constitutional provision "a tax upon all franchises of any kind or nature shall be entirely and exclusively for state purposes and shall be assessed and collected in the manner hereinafter provided." The manner provided is that taxes in the case of telephone corporations (and other corporations enumerated) shall be a specific percentage upon the gross

receipts; in the case of insurance companies (both domestic and foreign) a specific percentage of gross premiums.  As to each it was declared that the taxes so imposed were "in lieu of all other taxes, state, county and municipal, upon the property of the corporations" subject to certain specified exceptions which are not involved here.

In the case cited the court stated the claims of the respective parties on the appeal; that of the appellant being "that the constitutional provision relieves the companies named (telephone companies) from no burden except that of taxes *upon the property* theretofore enumerated and that the charge imposed by the ordinance is a business or occupation tax and not a tax upon property at all, and therefore not covered by the so-called exemption."

This is the identical point made by appellants here under their claim that the exemption being from "taxes" and "licenses upon the property of the company," the word "licenses" should, under the rule of strict construction of provisions under which exemption from taxes is claimed, be given the same meaning as taxes.

Defining the position of respondent in the cited case, the court said: "The respondent, on the other hand, claims that under a fair reading of the constitutional amendment the liability of a telephone company to pay a percentage of its gross receipts was designed to exclude the power of the state or any county or municipality to exact from it any further revenue . . . whether by way of a direct tax upon its property, or in the guise of a license-fee upon its business."

This is the position of the present respondent.  Hence the claims of the respective parties here as to the construction to be given the constitutional provision are the same as with those made by the respective parties there.  In disposing of the contention of the appellant in the cited case this court, after discussing the point made as to the rule of strict construction to be applied to provisions exempting from taxation and holding that the constitutional provision was to be interpreted upon a full consideration of all its terms, said: "Giving then, a fair and reasonable interpretation to the constitutional provision, we think the charge imposed by the ordinance of the city and county was within the class of taxes and licenses from the imposition of which the respondent was relieved by the amendment.  It is true that a license-tax upon an occupation

or business is not a tax upon property, even though, by constitutional or statutory definition, franchises are included in the meaning of the word 'property.' This is clearly decided in *City of Los Angeles* v. *Los Angeles Independent Gas Co.,* 152 Cal. 765, [93 Pac. 1006]. If the amendment did no more than to declare that the percentage required to be paid by telephone companies should be in lieu of all other taxes upon the property of such companies, it would seem to be a necessary conclusion that the power to impose an occupation tax was not excluded. But there are other words in the provision, and all of the language must, under familiar principles of construction, be considered and given its fair meaning and effect. The percentage imposed is declared to be in lieu, not merely of other taxes, but 'of all other taxes *and licenses* . . . upon the property.' The word 'license,' properly speaking, means a grant of permission or authority to do a particular thing or carry on a particular business. (*City of Sonora* v. *Curtin,* 137 Cal. 583, [70 Pac. 674]; Words & Phrases, p. 4137.) In the clause under discussion, the term is evidently used to designate the fee or charge imposed upon the exercise of the right. While such fee or charge is often spoken of as a tax, it is not in any sense a tax upon property. (See *City of Los Angeles* v. *Los Angeles Independent Gas Co.,* 152 Cal. 765, [93 Pac. 1006].) In order to construe the clause as relieving from taxes or charges upon property alone, we should, therefore, be required to deny meaning and significance to the word 'license.' The right of a telephone company to carry on the business of supplying telephone service is a franchise. Franchises are included in the enumeration of classes of property, which, by the terms of the amendment, are to be taxed for state purposes only. . . . Every word in the clause under discussion can be given a reasonable and legitimate effect by reading the term 'licenses' as including revenue charges of any character upon the exercise of the franchises which are declared to be taxable for state purposes only. In this way, the phrase 'upon the property above enumerated' is made fully effective as qualifying both 'taxes' and 'licenses' preceding it, while no word is either ignored or distorted from its fair meaning.''

We do not think in view of this decision just quoted, that further discussion on this branch of this appeal is necessary. The right of insurance companies, whether domestic or for-

eign, to do an insurance business in this state is a franchise; is property of the company engaged in it, and it is upon this franchise that under the provisions of the constitutional amendment the tax therein provided for, is levied. The state license-tax imposed under the act as it stood when the constitutional amendment was adopted, and under which the license-tax here in question was exacted, is a tax for revenue imposed—so far as insurance companies are concerned—on their franchise right to do business in the state. But as this franchise is taxed under the constitutional amendment and the tax thereby levied is declared to be in lieu of "all other taxes and licenses, *state,* county, and municipal, upon the property of such companies," the effect of the amendment was to supersede the prior state License Tax Act so far as it applied to insurance companies and to exempt them from the provisions thereof as to the payment of the license-tax thereunder.

The judgment appealed from is therefore reversed.